UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LENORA LEWIN,
PLAINTIFF

CASE NO. 1:08CV00223
(SPIEGEL, J.)
(HOGAN, M.J.)

VS.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
DEFENDANT

## REPORT AND RECOMMENDATION

Plaintiff filed her application for Social Security Disability and Supplemental Security Income benefits in January, 2004. She alleged an onset date of June 19, 2002. Plaintiff's application was denied both initially and upon reconsideration. She then requested and obtained a hearing before an Administrative Law Judge (ALJ) in August, 2006 at Cincinnati, Ohio. Plaintiff, who was represented by counsel, testified at the hearing as did witness Cecelia Backerella (aka Vacerella) and Vocational Expert (VE) Janice Bending. An unfavorable decision was rendered in March, 2007. Plaintiff then processed an appeal to the Appeals Council, which denied review in January, 2008. Plaintiff then timely filed her Complaint seeking judicial review in March, 2008.

## STATEMENTS OF ERROR

Plaintiff asserted four Statements of Error as follows: (1) The ALJ failed to find that Plaintiff's wrist tendonitis was a severe impairment and thus failed to provide limitations for this impairment in the residual functional capacity attributed to Plaintiff. (2) The ALJ erred by improperly framing his hypothetical questions and thus he did not get accurate testimony regarding whether a significant number of jobs were available. (3) The ALJ erred by relying on

vague, inaccurate testimony from the vocational expert. (4) The ALJ improperly assessed Plaintiff's credibility with respect to Social Security Ruling 96-7p.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that she resides in a apartment in Georgetown, Ohio with her two children, one of which is a ten-year-old, who visits periodically from Las Vegas, where he lives, we assume, with his father She completed the eighth grade in special education classes. She attended St. Francis DeSales for the first six grades and Peoples Junior High for grades seven and eight. Plaintiff testified that she was 5'3" and weighed 228 lbs. From 1991 to 2002, Plaintiff worked at a factory warehouse, one of which was at Spaulding Light Corp., where she made lights. She left her employment on June 19, 2002 after ending up in the hospital after a bout with atrial fibrillation. Prior employment was as a change person at a casino, where she changed coins or chips for currency and/or vice versa.

When asked why she could not work, Plaintiff responded that she had Graves disease, a condition she has had since 2000. Plaintiff stated that she treats for the problem at University Hospital, where she was subjected to radiation therapy in March, 2004. She stated that Graves disease causes cramps, diarrhea, eye pain, and blurry vision and that the side effects of radiation were headaches and lightheadedness. She takes Levothroxin for headaches and Atenolol for high blood pressure. She also takes Vicodin for arthritic knees and described her left as being worse than the right. Plaintiff estimated her knee pain at a seven on a ten-point scale with or without medication.

Plaintiff testified that she also has carpel tunnel syndrome and that her right wrist hurts constantly and her left wrist hurts periodically. She sees Dr. Dixon for her carpel tunnel problem on a bi-monthly basis. She said that she is able to operate a vacuum cleaner, drive a motor vehicle, cook, load the dishwasher and shop for groceries, but she has difficulty carrying the groceries.

Graves disease affects her eyes. She testified that she lays a wet washcloth on her eyes four times per day for a ten-minute period. She testified that she needs bathroom breaks at the rate of four to five per day for approximately fifteen minutes for diarrhea occasioned by severe

cramps. She estimated that she could walk about a block before suffering from shortness of breath. She relates her eye problems, shortness of breath, diarrhea, muscle pain and fatigue to Graves disease. She is depressed and may be bipolar.

Plaintiff told the ALJ that she could sit for 30 minutes at a time and lift ten pounds. (Tr. 559-597).

Cecilia Backerella is Plaintiff's sister. Ms. Backerella testified that she sees her sister every other day for seven to eight hours, more often than not at Ms. Backerella's home. Plaintiff's sister said that she is able to help Plaintiff care for the baby, dust and shop for groceries. Ms. Backerella confirmed that Plaintiff makes frequent bathroom visits, is frequently fatigued and uses cold compresses to ease eye pain. She also testified that Plaintiff is mentally slow. (Tr. 598-609).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The first hypothetical question, and the one which contained the residual functional capacity assessment ultimately adopted by the ALJ, asked the VE to assume that Plaintiff could lift 20 lbs. occasionally and 10 lbs. frequently, could stand/walk for 2 hours, but not more than 30 minutes without a break, could occasionally climb, frequently balance, but never stoop, crouch, crawl or kneel. Plaintiff should avoid public interaction, but can superficially interact with coworkers and supervisors. She would be best with routine, repetitive tasks, but should avoid a constantly rapid pace. The VE identified the job of accounting and auditing clerk, office machine operator and office clerk, all of which are unskilled and sedentary jobs which exist in representative numbers in the national economy.

The second hypothetical question contained all the elements of the first and added that Plaintiff could handle and finger on a frequent basis, up to 2/3 of an eight-hour day. The VE responded that the jobs of auditing clerk, accounting clerk and office machine operator would be eliminated, but the job of general office clerk would be retained. Plaintiff could also perform the job of sedentary and unskilled production worker, but the number of jobs would be reduced because some production workers have quotas. There would remain a number of representative jobs in the national economy in the VE's opinion.

The third hypothetical was based on the accuracy of Plaintiff's testimony. If Plaintiff's statement of her residual functional capacity were accurate, Plaintiff would be unemployable.

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff suffers from a combination of severe impairments consisting of morbid obesity, Graves disease, bilateral knee pain, left greater than right, and borderline intellectual functioning. The ALJ found that none of the individual impairments, considered alone or in combination, met any listing. The ALJ further found that Plaintiff was unable to perform her past relevant work, but had the residual functional capacity to perform as described in the first hypothetical question to the VE and therefore could perform a number of unskilled and sedentary jobs, which exist in representative numbers in the national economy.

## MEDICAL RECORD

Records from St. Francis DeSales School, an elementary school, show that Plaintiff's deficiencies in terms of grades began to show when she was in the sixth grade. Her standardized test scores put her in the 13th percentile in the verbal abilities category and in the 33rd percentile in the quantitative abilities category in the 4th grade. Those scores were 36th percentile and 26th percentile, respectively, in the sixth grade. The Metropolitan Achievement Test results put Plaintiff in the 7th percentile in total language skills and in the 16th percentile for total math skills. The Iowa Tests of Basic Skills had Plaintiff in the 20th percentile for total language and in the 1st percentile for total mathematics.. (Tr. 184).

There is a form entitled "Basic Medical" under date of April, 2003 in which the author, a physician, whose name we cannot read and whose specialty is internal medicine, indicated that Plaintiff suffered from Graves disease, hypothyroidism and GERD, referred Plaintiff for an endocrinology consult at University Hospital, indicated that neither standing/walking nor sitting were affected, but that Plaintiff's ability to lift was affected. The physician opined that Plaintiff could frequently lift 6-10 lbs and that she was unemployable for a period from 30 days to 9 months. (Tr., Pgs. 186-187).

In May, 2001, Plaintiff presented at the emergency room of University Hospital with a complaint of right foot pain as a result of kicking her couch. It was discovered that she had an "acute fracture of the right 5th toe." She was given analgesia and placed in a hard-soled shoe, prescribed Vicodin and Ibuprofen and instructed to elevate and ice her foot when possible. (Tr., Pgs. 216-217).

In June, 2002, Plaintiff presented at the emergency room of Mercy Anderson Hospital with a complaint of chest pain and slight nausea. After a diagnosis of "new onset atrial fibrillation with rapid ventricular response and rate induced angina," Plaintiff left the hospital against medical advice, but later returned (Tr., Pgs. 226-229).

In July, 2002, Plaintiff was involved in an automobile accident and was seen in the emergency room at Mercy Anderson Hospital for left arm pain. The diagnosis was "contusion, left humerus." (Tr., Pgs. 231-233).

In June, 2002, Plaintiff was admitted to Mercy Anderson Hospital for atrial fibrillation. Sai Kumar Hanumanthu, M.D. prescribed Toprol and recommended thyroid function testing and an echocardiogram. (Tr. Pgs. 235-236).

In August, 2002, Plaintiff presented at the emergency room of University Hospital with a complaint of right ear pain. The history indicated that Plaintiff had suffered from "recurrent otitis media and tympanic membrane perforation bilaterally." Cipro and Augmentin were prescribed. Her problem was eventually diagnosed as "cholesteatoma." (Tr. 245-250).

Plaintiff was evaluated in September, 2002 by Ali Arani, M.D., whose specialties are internal medicine and cardiology. Dr. Arani determined that Plaintiff had a "hypoactive thyroid, which makes her heart beat faster." Her thyroid gland was enlarged. An MRI of her right ear indicated the presence of a "non-malignant tumor, which needed to be evacuated." She has had "chronic ear infections since childhood and has lost some of her hearing," but "is able to hear normal conversation." She has no restrictions regarding sitting or walking and is able to maintain attention, concentrate and answer questions. Her reports of chest discomfort are related to hypothyroidism. There was no murmur or enlarged heart. Her gait was normal. There was no evidence of decreased range of motion in any joint and no evidence of sensory or reflex changes. Muscle testing was normal. (Tr. 262-270).

In November, 2003, Plaintiff was seen in the emergency room of Mercy Anderson

Hospital for atrial fibrillation. She had a history of an overactive thyroid gland. She stopped taking Tapazole and all medications several months ago. Francis Collins, M.D., put her on oral Tapazole and a beta blocker. She was diagnosed with " acute thyrotoxicosis with rapid atrial fibrillation." Dr. Hanumanthu, a cardiologist, indicated that a echocardiogram would be in order after her heart rate was under control. Dr. Collins indicated that Plaintiff's heart rate "slowed nicely with the initiation of beta blockers." (Tr. 274-279).

A psychological examination was done in March, 2004 by Norman Berg, Ph.D., a clinical psychologist at Xavier University. Plaintiff described her problems as Graves disease, fatigue, poor control of bowel movements, shakiness and an irregular heart, right leg pain and feeling cold. Her Full-Scale IQ was 64 with a Performance IQ of 69 and a Verbal IQ of 65, scores that Dr. Berg felt were "underestimates of the claimant's intellectual functioning." He assigned a GAF of 66. Dr. Berg's opinion was that Plaintiff would have no limitations of her ability to understand and follow simple verbal directions, mild limitations of her ability to maintain attention and concentration and mild limitations of her ability to relate adequately to others and to sustain a level of activity. She would have mild to moderate limitations of her ability to cope with routine job stress. (Tr. 280-285).

Thyroid imaging done at University Hospital in March, 2004, showed "a diffusely enlarged thyroid gland." (Tr. 287-288).

Plaintiff was seen in the emergency room of University Hospital in July, 2004 for left knee pain, diagnosed as a "left knee sprain." She was prescribed Diclofenac and told to use warm compresses for pain and cold compresses for swelling. (Tr. 298-299).

Plaintiff was the subject of a psychological evaluation by Patricia Summelman, Ph.D. in September, 2004. Dr. Summelman's conclusion was that Plaintiff had borderline intellectual functioning and moderate limitations of her ability to understand, remember and carry out detailed instructions, her ability to maintain attention and concentration for extended periods and her ability to complete a normal workweek without interruptions from psychologically-based symptoms. Otherwise, Plaintiff had no significant limitations in any category of understanding and memory, sustained concentration and persistence, social interaction or adaptation. Rod Coffman, Ph.D. was in agreement. (Tr. 301-316).

A medical evaluation by Paul Heban, M.D. in September, 2004 indicated that Plaintiff

had "chronic otitis media, cholesteotoma, Graves disease and left knee pain without swelling, crepitus or ligamentous laxity." Dr. Heban attributed her bouts with atrial fibrillation and thyrotoxicosis to her failure to take prescribed medication as indicated. Dr. Heban concluded that Plaintiff's "condition was not severe." (Tr. 317).

There are records from Brown County General Hospital, which show that Plaintiff was seen in the emergency room in April, 2006 for heart racing and shortness of breath, but discharged after being treated with medications and referred to her family practice physician. (Tr. 319-325). She was seen in January, 2006 for left hand pain after falling against a door. X-rays showed there was no fracture or dislocation. She was placed in a splint, given a prescription for Vicodin and diagnosed with a "contusion of the hand." (Tr. 326-332).

In November, 2005, Plaintiff underwent a sterilization procedure at Brown County General hospital. Judith Varnau, D.O., the surgeon, indicated that the surgery was uneventful. (Tr. 338-340).

Plaintiff visited the same hospital in September, 2005 for chest and right ear pain. She was diagnosed with an upper respiratory infection with bronchitis, given medications and sent home. (Tr. 341-346).

Another visit occurred in September, 2005 for abdominal pain. This time she was diagnosed with a urinary tract infection, treated with Bactrim and Pyridium and referred to her primary care physician. (Tr. 347-356).

Another visit occurred in March, 2005 for a sinus infection and earache. She was diagnoses with right frontal sinusitis, prescribed Amoxicillin, Allegra D and Vicodin. (Tr. 357-362).

Plaintiff had arthroscopic surgery in February, 2006 at University Hospital to repair a left meniscus tear. Estrelita Dixon, M.D. was in charge of her post-operative care. In March, 2006, Dr. Dixon observed that Plaintiff had better movement of the knee, but was experiencing clicking and locking. Dr. Dixon said that Plaintiff had degenerative changes and if her symptoms could not be controlled, she might be a candidate for a knee replacement. Physical therapy was recommended. (Tr. 366). Hein Tuan Le, M.D. was the surgeon who repaired Plaintiff's left meniscus tear in February, 2006. (Tr. 377-378). In January, 2006, Plaintiff saw Christian Safian, M.D. for a follow up of left knee pain, diagnosed as a bone contusion in December, 2004. She

was unable to complete physical therapy. A left medial meniscus tear was thought to be the cause of her knee pain. (Tr. 411).

In December, 2004, Plaintiff was seen at University Hospital by Bart Branam, M.D. for left knee pain. X-rays were negative for fracture or dislocation, but showed a tibia bone bruise and a femoral condyle bone bruise. She was told to use crutches to allow the bone bruises to heal and to take Vicodin. (Tr. 447-448). X-rays taken in December, 2004 showed "mild arthrosis in the medial compartment of the left knee." (Tr. 450). In October, 2004, Plaintiff was seen at the emergency room of University Hospital with left knee pain that she had been experiencing for 2-3 months. She was prescribed Narposyn and Vicodin and referred to an orthopaedist. (Tr. 466-468). Subsequent physical therapy focused on quad strengthening. (Tr. 474). An MRI in August, 2004 demonstrated "tricompartmental chondromalacia, left medial tibial lateral contusion and debris posterior to the transverse ligament." (Tr. 478-479).

Dr. Dixon completed a Medical Assessment of Ability to do Work-Related Activities in July, 2006. The medical findings supporting Dr. Dixon's opinion are listed as "wrist pain - tendonitis, especially of right wrist, chronic left knee pain - degenerative changes." Dr. Dixon said that Plaintiff could lift 20 lbs. occasionally and 10 lbs. frequently. She said that Plaintiff could stand/walk for 2 hours in a workday, but not more than 1/2 hour at a time. Sitting was unaffected. She could frequently balance, occasionally climb, but should never stoop, crouch, kneel or crawl. Plaintiff's ability to feel was affected by her impairment. Dr. Dixon was uncertain about the number of days Plaintiff would be absent from work due to symptoms associated with her medical condition. (Tr. 493-495).

A chest x-ray, performed in December, 2006, was negative. (Tr. 523).

Surgery was performed in December, 2006 on Plaintiff's left ear by Ravi Samy, M.D. at University Hospital. The procedure was called a mastoidectomy. Preoperative testing indicated a possible cholesteatoma and an angiogram showed conductive hearing loss. The postoperative diagnosis, however, was "left middle ear mucoid effusion, probable cholesterol granuloma," a diagnosis which was confirmed by a pathology report. (Tr. 524-536).

Lastly, an x-ray of Plaintiff's wrists in February, 2007 showed "no osseous, articular or soft tissue abnormality bilaterally." (Tr. 537).

**OPINION**

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is

9

made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen,* No. 87-6189, slip op. At 4 (6th Cir. Oct.28, 1988). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985).

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id.*, § 200.00(e)(1). Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id.*, § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The existence of a minor nonexertional impairment is insufficient to preclude use of the grid for directing a decision. Rather, plaintiff must demonstrate that the nonexertional impairment "significantly limits" his ability to do a full range of work at the appropriate exertional level in order to preclude a grid based decision. *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 572 (6th Cir. 1989); *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771-72 (6th Cir. 1987); *Kimbrough v. Secretary of H.H.S.*, 801 F.2d 794, 796 (6th Cir. 1986).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical

11

question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano*, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.*, 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review.

*Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate

review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

The first Statement of Error faults the ALJ for his failure to find that Plaintiff's left wrist tendonitis was a severe impairment and to provide limitations for that impairment in his reserve functional capacity assessment. The ALJ found no objective evidence suggesting any basis for right wrist limitations. The reasons for the conclusion were: (1) The wrist exam by Dr. Dixon in December, 2006 showed good range of motion; (2) Wrist x-rays were negative bilaterally in

14

February, 2007; and (3) Dr. Dixon's assessment in December, 2006 failed to include any limitation regarding Plaintiff's wrists. Plaintiff's argument is based on the subjective observations of Plaintiff and her sister, but also on certain conduct by Dr. Dixon. Plaintiff complained of wrist pain in July 19, 2006, in December, 2006 and in February, 2007. Ms. Bacerella testified that she often helped Plaintiff hold and lift her baby. Perhaps more significant is Dr. Dixon's reaction to Plaintiff's complaints. In July, 2006, Dr. Dixon noted that Plaintiff had wrist tendonitis and prescribed braces. She also prescribed Vicodin for pain. (Tr. 501). Also in July, 2006, Dr. Dixon indicated that Plaintiff had tendonitis of the wrist and that handling and fingering were affected. (Tr. 494). In December, 2006, Dr. Dixon referred Plaintiff to the Hand Clinic. (Tr. 521).

The evidence pointing in the opposite direction was that Dr. Dixon's examination in December, 2006 showed good range of motion in the wrists (Tr. 521) and x-rays taken then were normal. (Tr. 537). The ALJ commented that Dr. Dixon did not include anything about Plaintiff's wrists as part of her assessment; however Dr. Dixon did say that Plaintiff's wrist tendonitis affected Plaintiff's ability to lift and carry and thus concluded that she could lift 10 lbs. frequently and 20 lbs. occasionally and that her ability to handle and finger were affected. When dealing with a soft tissue injury, where there is no hard evidence such as x-rays or MRIs, the opinion of the physician should not simply be disregarded. On the other hand, Dr. Dixon's comment on the wrist impairment was that it "affects lifting, handling, fingering *for the time being*. (Emphasis added.). This comment in July, 2006 would support a conclusion that the impairment was seen as a temporary one.

That the ALJ was tempted to include some type of handling/fingering limitation is apparent from the fact that a second hypothetical question incorporating a limitation, albeit a slight one, for fingering and handling was asked. Although the colloquy between the ALJ and Dr. Bending could have been more clear, Dr. Bending did say that if that hypothetical were to accepted as accurate, the number of available types of jobs would be restricted as would the total number of jobs, but that the job of sedentary and unskilled office clerk would remain in representative numbers. It was the numbers relative to the job of production worker that would be restricted, not because of the handling/fingering restriction, but because one of the ALJ's restrictions was that working at a rapid pace should be avoided. If the number of the office clerk positions remained unaffected by the handling/fingering limitation, the arguable error in failing to clarify how many production workers

15

remained was harmless. The ALJ's failure to consider Plaintiff's right wrist tendonitis to be a severe impairment, although arguably erroneous, was accommodated to the extent that the evidence supported it. The ALJ made no prejudicial error.

The second Statement of Error faults the ALJ for his failure to include, in his hypothetical question to the VE, a restriction to jobs limited to understanding, remembering and carrying out simple one and two-step instructions and jobs involving routine and repetitive tasks, superficial contact with people and no constant rapid pace. We disagree that the ALJ failed to include a restriction to jobs involving routine and repetitive tasks and jobs involving only superficial contact with people and those not performed at a constant rapid pace. However, as Plaintiff asserts, the ALJ failed to specifically include a limitation to jobs involving simple one and-two step instructions, but the ALJ did ask the VE to assume that Plaintiff could "understand and follow at least one to three-step in complicated oral directions." The question, therefore, is whether or not substantial evidence supports the ALJ's conclusion that Plaintiff has the residual functional capacity to understand and follow three-step directions. Dr. Berg's conclusion was that despite Plaintiff's Full-Scale IQ of 64, she would have "no limitations of her ability to follow simple verbal directions." Dr. Semmelman's conclusion was that Plaintiff had "borderline intellectual functioning" and had a "moderate limitation of her ability to understand, remember and carry out *detailed* instructions." (Emphasis added). Plaintiff's achievement scores in elementary school suggest that she has intellectual limitations as her sister so stated.

On the other hand, Plaintiff was employed for a significant period of time at Spaulding Light Corporation. in an assembly-type position and also worked at a casino handling money. She didn't leave either position because of any intellectual deficits. The ALJ had the occasion to see Plaintiff and evaluate the manner in which she testified and responded to questions. While one might disagree with the description of Plaintiff which the ALJ communicated to the VE by means of his hypothetical question, substantial evidence supports his view, although we would concede that the evidence is less substantial than in some cases.

An additional point under this Statement of Error concerns the failure of the ALJ to include Plaintiff's reading level in his hypothetical question. It certainly is arguable that this failure demonstrates error, but unless the error is prejudicial to Plaintiff, it is purely an academic issue. The

16

mere fact that Plaintiff has the capacity to understand, remember and carry out instructions does not mean that she has the capacity to read them. On the other hand, the VE acknowledged that the job of accounting and auditing clerk could be performed by a person with a fourth grade reading level. So could the job of general office clerk. It would appear from the VE's testimony that the jobs of accounting and auditing clerk would be eliminated by the handling and fingering limitation, notwithstanding the Plaintiff's reading level, but the job of general office clerk would not. Thus the error, if there was one, is harmless.

Yet another point under Statement of Error No. 2 is that the ALJ erred by concluding that the terms "stoop" and "squat" are synonymous. They clearly are not as any athlete would know. Stooping involves bending forward from the back with the knees somewhat locked. Squatting involves bending at the knees with the back relatively straight. Dr. Dixon voiced her opinion that Plaintiff should never stoop; she was not asked about squatting, but common sense would indicate that a morbidly obese woman who had arthroscopic surgery to repair a meniscus in her left knee, had thereafter experienced arthritic changes in the left knee and was taking pain medication for left knee pain should avoid squatting. Dr. Dixon also precluded Plaintiff from "crouching," which is much more close in meaning to "squatting" than "stooping." The ALJ did not restrict Plaintiff from "stooping" as Dr. Dixon had suggested. Thus, we are left in the dark about Plaintiff's ability to perform the job of general office clerk because we do not know whether that job involves "stooping" and an inability to "stoop" should have been a part of the description contained in the ALJ's hypothetical question. This is error justifying a remand.

The Third Statement of Error is that the ALJ erred by relying upon the VE's job selection when no DOT references were cited. In this respect, it is the job of general office clerk that is problematic. That job is listed in the *Dictionary of Occupational Titles* (DOT) as one at the semi-skilled level and at the light exertional level. Neither job requirement meets the ALJ's hypothetical for unskilled and sedentary work. The ALJ's reliance upon Dr. Bending's representation that she would identify any jobs in conflict with the DOT was erroneous, since she did not identify the job of general office clerk as being such a job. This is also error justifying a remand.

The Fourth Statement of Error faults the ALJ for his assessment of Plaintiff's credibility. The ALJ concluded that Plaintiff's testimony was "partially, but not fully credible." The ALJ found

17

that Plaintiff "exaggerated her pain, side effects from medication and resulting limitations, given the relative mild to moderate objective clinical signs and laboratory findings." Although Plaintiff did have surgery on her left knee and experienced degenerative changes which could lead to knee replacement, her post-operative treatment was conservative as the ALJ observed. While not discussed, it seems logical to us that Plaintiff's weight may well put undue stress on her knee and result in a certain amount of pain. On the other hand, Plaintiff was able to cook, drive, shop and to a certain extent, clean her dwelling. She also appeared live before the ALJ, who was in a position to observe her movements and facial expressions. Thus, we cannot say that the ALJ's credibility determination was erroneous.

For the reasons stated above, the Court finds that the ALJ's decision is not supported by substantial evidence and should be reversed.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish Plaintiff's entitlement to benefits. *Faucher,* 17 F.3d at 176. This matter should be remanded for further proceedings, including a reformulation of a hypothetical question to the VE which more adequately describes Plaintiff in all pertinent respects and further vocational considerations consistent with this decision.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner by **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

April 20, 2009

Timothy S. Hogan
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\HOGANTS\lewin.wpd